Argued September 20, affirmed October 7, 1974

# STATE OF OREGON, *Respondent, v.* KIMBERLEY KAY GROSS (No. C 73-11-3588 Cr), *Appellant.*

526 P2d 1050

*A. Allan Franzke,* Portland, argued the cause for appellant. With him on the brief were Souther, Spaulding, Kinsey, Williamson & Schwabe and Ridgway K. Foley, Jr., Portland.

*Janet A. Metcalf,* Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and TANZER, Judges.

LANGTRY, J.

Defendant appeals from conviction in a jury trial of two counts of manslaughter. The deaths occurred in a two-vehicle accident shortly after midnight on August 5, 1973 in the westbound lanes of Freeway 80N near Bonneville Dam. Defendant was in an eastbound vehicle with a male companion and another young man and woman. They had all been partaking of dangerous drugs, marihuana, and beer; all were "tipsy." Two or three had tried to drive, and their vehicle entered the freeway going eastbound, the wrong direction, past multiple warning signs. Since the accident, the defendant has suffered from amnesia and does not remember what occurred. The two people in the westbound vehicle were killed; all four in the eastbound vehicle were injured, three seriously. The only assignment of error is that there was insufficient evidence defendant was the driver of the vehicle she was in, and motions for acquittal and directed verdict should have been granted.

■ After the jury verdict, we look to the evidence most favorable to the state's case to see if it, if believed by the jury, could support the verdict.

"* * * In deciding whether the circumstances are sufficient to entitle the jury to find beyond a reasonable doubt that defendant was guilty, we must remember that it is not proper for us to hold that there is a reasonable doubt because of conflicts in the evidence. After a verdict of guilt, or in deciding whether the case should be submitted to the jury, such conflicts must be treated as if they had been decided in the State's favor. After the conflicts have been so decided, we take such decided facts together with those facts about which there is no conflict and determine whether the inferences that may be drawn from them are sufficient to allow the jury to find defendant's guilt beyond a reasonable doubt. *State v. Zauner*, 250 Or 105, 110, 441 P2d 85 (1968); *State v. Dennis*, 177 Or 73, 78, 159 P2d 838, 161 P2d 670 (1945). Our decision is not whether we believe defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for a jury to so find. *State v. Zauner, supra.*" *State v. Krummacher*, 269 Or 125, 137-38, 523 P2d 1009 (1974).

■ Every rational hypothesis other than guilt need not be excluded in deciding whether there was enough evidence for the trial court to have submitted the case to the jury. *Id* 269 Or at 139-40.

We need repeat only two excerpts from the evidence and a few physical facts to demonstrate that the question of guilt in this case was for the jury.

There was direct evidence from which it could be inferred defendant was driving. Miss Caldwell, the other female occupant, the one who was not seriously injured, testified:

"Q All right. What happened after Bob said he wasn't going to drive any more?

"A Then Kim [defendant] drove; Kim took over.

"* * * * *.

"Q All right. Tell me what you recall, then, after Kim started driving.

"A I was sitting behind her in the back seat, and I remember glancing at the speedometer, because she couldn't drive too well, herself, and she was going about — oh, between 30 and 40. And I asked her if she would please slow down to, you know, 10 or 20, and her driving, you know — might make — her driving might improve if she slowed down. And so she did that.

"And then the next thing I remember after that, coming straight for a sign that looked as if we were going to hit it. And everybody ——

"Q All right. Describe this sign for us.

"A As I recall it, it was a 'Do not enter' sign. It was a white, square sign with the red circle in it, in the center. It said 'Do not enter.'

"* * * * *.

"Q What do you remember, if anything, after the sign?

"A That's it. When I saw the sign coming, everybody yelled. And Tony was on my right, and he had his arm around my shoulder. And he pulled me down like into his lap, like as if to protect me or something. And that is the last thing I remember.

"Q When is the next clear memory that you have?

"A Waking up in the hospital."

■ The accident happened several miles after the entry onto the freeway could have been made, so this testimony was foggy, as was the testimony of all the vehicle's occupants, and it was sharply questioned on cross-examination, but it nevertheless could be the basis, or at least part of the basis, for a jury finding.

With reference to the location of defendant in the vehicle after the accident, Mr. Coats, the first ambulance operator to arrive at the scene, testified:

"Q  What did you find in this vehicle?

"A  The young lady, her head approximately under the steering wheel, one foot—I couldn't say which one — entangled in the clutch pedals and so on.

"* * * * *.

"Q  Was it actually physically tangled there so it couldn't even move?

"A  Yes, it was.

"Q  Did you have to remove it or anything to get her out of the car?

"A  I removed her foot from the position it was in by enlisting other help when the third ambulance got there. We lifted her body and unhooked her foot from the ——"

Testimony from other witnesses also was that defendant's feet were at the same location, although they did not say they were "hooked" there.

Defendant's case was bottomed on the contention that defendant's companion in the front seat, Mr. Blum, was driving. He was found unconscious outside the "wrong way" vehicle to its left. A picture in evidence shows that about three-fourths of the windshield, all except about one-fourth on the passenger side, was broken out and was draped over the hood of the car, and in front of it. The principal shatter marks in this piece were shown to be on its right side.

One of defendant's legs was broken in the thigh, consistent with its having come up from below and into the steering wheel. Pictures in evidence show that the principal impact on the "wrong way" vehicle

was straight-on, and on the other it was the left front and side. Blum had a broken right wrist, a broken left clavicle and multiple lacerations of the left chest. All of these physical facts are consistent with the theory that Mr. Blum was on the passenger side and was thrown by the impact through the windshield, and defendant was driving. Thus, we hold the evidence was such that the question of guilt was to be decided by the jury.

Affirmed.